[Crim. No. 18848. Second Dist., Div. Five. July 26, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES ELSTON BETHEA, Defendant and Appellant.

**COUNSEL**

Jesse L. Halpern, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—By information, defendant was charged with robbery while armed with a gun (Pen. Code, § 211), and he pleaded not guilty.

After a jury trial, defendant was found guilty of first degree robbery, and the allegation of being armed at the time of commission of the offense was found to be true. Defendant's motion for a new trial was denied, probation was denied, and defendant was sentenced to state prison for the term prescribed by law. Defendant appeals from the judgment.

On February 22, 1968, Hector Aguilar was working as the manager of the Woodlawn Liquor Store located at 128 East Santa Barbara Street, Los Angeles. At about 8 p.m., he noticed a man in a long, black trench coat enter the store; there were approximately six to eight, "maybe more," customers in the store. While ringing up a customer's order, Aguilar kept glancing at the man in the coat and observed defendant alongside the man. Defendant vaulted over the counter with a gun in his hand and ordered Aguilar's clerk on the floor. The clerk was "stomped" on by defendant for attempting to reach a silent alarm button, and defendant struck Aguilar in the back of the head with the gun for not giving up the cash. Aguilar did not lose consciousness from the blow; he took approximately $500 from the cash register, put it in a bag, and handed it to defendant. Defendant then ordered Aguilar to the floor and fled with the money. On his knees, Aguilar reached into a drawer, grabbed a gun, and then went after defendant but was unable to apprehend him.

Aguilar testified he was certain that defendant was the robber with the gun. The robbery lasted three to five minutes, and Aguilar spent three-quarters of the time observing defendant's face. Defendant was wearing a grey pair of slacks and a black "Eisenhower jacket." Aguilar had been the victim of three robberies.

Aguilar was shown photographs on three or four occasions. Officer John Noonan first showed Aguilar a group of six or seven photographs at Aguilar's place of business within a week of the robbery. Aguilar picked out the photograph of the man who had worn the trench coat at the time of the robbery. Within the next week, again at his place of business, Aguilar was shown a second group of seven or eight photographs of male Negroes. The officer asked Aguilar to "look at the pictures." There was nothing unusual about defendant's photograph which made it stand out from the other photographs. Aguilar looked through the second group of photographs twice, the first time selecting four photographs. From these four photographs he picked out defendant's photograph as the likeness of the robber in the Eisenhower jacket. After seeing defendant's photograph, Aguilar said to the officer, "This is the one." Aguilar was shown a third set of seven to eight photographs, also during 1968, from which he again picked out defendant's photograph as the likeness of the robber in the

Eisenhower jacket. Before showing the photographs to Aguilar, the officers stated they wanted to make sure of the identity of the perpetrator.

Aguilar testified that there was no doubt in his mind that he could identify defendant based on his observations at the store, independently of his looking at defendant's photograph.

At the trial, Officer J. E. Guterding appeared in court in answer to a subpoena duces tecum. Officer Guterding was unable to produce the photographs used in the 1968 identifications. Officer Noonan testified that he had made a search of the records at Newton police station, but was unable to locate the photographs shown to Aguilar in 1968.

On March 5, 1970, Officer Noonan returned defendant, under extradition, from Chicago to Los Angeles after defendant had voluntarily waived a formal extradition hearing. On March 6, 1970, Officer Noonan showed Aguilar a group of nine photographs. Defendant's photograph was somewhere in the middle of the group. Officer Noonan did not suggest in any way which photograph Aguilar was to pick out, and Aguilar picked out defendant's photograph. These photographs were introduced into evidence as People's Exhibit 1.

Defendant's wife testified that she and defendant left for Chicago approximately two or three days after February 14, 1968, and remained there for the next two years; that during this time defendant did not return to California. She testified that there was no possible way defendant could have been in Los Angeles on February 20, 1968. The prosecution introduced rebuttal evidence that defendant had been arrested for driving under the influence of intoxicating liquor on February 14, 1968, and had appeared in Division 35 of the Los Angeles Municipal Court on February 20, 1968. A certified copy of the February 20, 1968, docket of the Los Angeles Municipal Court was received into evidence as People's Exhibit 2. Defendant's photograph, taken on February 14, 1968, when booked for this arrest, was also received into evidence as People's Exhibit 3. A defense motion requesting two weeks' continuance to investigate the preparation and trustworthiness of People's Exhibit 2 (certified copy of the February 20, 1968, municipal court docket) was denied.

Defendant contends:[1] (1) the prosecutor's remarks in his closing argument violated the *Griffin* rule and constituted prejudicial error; (2) the trial court's refusal to grant a continuance amounted to a denial of due process of law; (3) admission of the in-court identification by Aguilar violated

---

[1]We omit the contention numbered "I" in appellant's opening brief as it is not in issue here, and for practical purposes have combined certain of his other numbered contentions; thus our numbering does not correspond with appellant's numbering.

the Sixth and Fourteenth Amendments of the federal Constitution; (4) failure of the prosecution to produce (certain of the) photographs shown to the complaining witness resulted in a denial of due process of law; (5) the delay in commencement of defendant's prosecution resulted in a denial of due process of law; (6) defendant was denied due process of law as guaranteed by the state and federal Constitutions because the prosecution failed to meet the burden of showing that the eyewitness identification "was the product of the witness' independent recollection and not the result of the suggestiveness of the court's proceedings."

■ Defendant's contention (1) is that the prosecution's remarks in his closing argument violated the rule established in *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], which prohibits references to a defendant's assertion of his Fifth Amendment right against self-incrimination and his not taking the stand in his own defense. During the deputy district attorney's opening argument, he alluded to the testimony of defendant's wife that she and defendant had moved from Los Angeles to Chicago and that there was no possible way that defendant could have been in Los Angeles on February 20, 1968. The deputy then referred to the certified copy of the municipal court docket which shows that defendant was in the Los Angeles court on February 20, 1968. The deputy then stated to the jury: "So, ladies and gentlemen, basically what this case boils down to is that we have the prosecution's positive evidence that the defendant is guilty of robbery in the first degree, and we have the defense which has just been shot out of the water, zero. So you have the prosecution's case against nothing for the defense. The state of the record is that there has been no explanation given for this, and you will get the exhibits in the jury room, and you will determine whether or not the defendant is guilty beyond a reasonable doubt." Defendant claims these remarks constitute prejudicial error. The remarks made by the prosecution go to the state of the evidence, which is entirely proper. (*People* v. *Hardy,* 271 Cal. App.2d 322, 330-331 [76 Cal.Rptr. 557]; *People* v. *Burns,* 270 Cal.App.2d 238, 247 [75 Cal.Rptr. 688].) There is absolutely no reference to the fact that defendant did not take the stand; nor is the remark susceptible of such interpretation by inference or innuendo.

■ Defendant next claims that the refusal of the trial court to grant a continuance was a denial of due process of law. Defendant's assertion is based on his claim that the prosecution's evidence (the municipal court docket) which rebutted defendant's wife's testimony that they were in Chicago at the time of the crime, came as a complete surprise. He claims that his request for two weeks' continuance would have provided time to investigate and find witnesses on the validity of the evidence. ■ A continuance will be granted when the ends of justice require it. (Pen. Code,

§ 1050.) It is established law that the determination of whether a defendant has affirmatively demonstrated that justice requires a continuance is a factual matter and will not be disturbed on appeal in the absence of a clear abuse of discretion by the trial court. (*People* v. *Johnson,* 5 Cal.App. 3d 851, 859 [85 Cal.Rptr. 485]; *People* v. *Martinez,* 264 Cal.App.2d 906, 913 [70 Cal.Rptr. 918]; see *People* v. *Douglas,* 61 Cal.2d 430, 435-436 [38 Cal.Rptr. 884, 392 P.2d 964]; *People* v. *Buckowski,* 37 Cal.2d 629, 631 [233 P.2d 912].) ■ Defendant's only claim is the possible invalidity of the certified copy of the municipal court docket. Although defendant had ample opportunity from the time of the jury verdict on July 2, 1970, to the time of his motion for a new trial on July 23, 1970 (three weeks later), to investigate and produce new evidence in support of his motion, he did nothing. Defendant made no affirmative showing that the ends of justice required a continuance, and the trial court clearly did not abuse its discretion in denying the motion for a two weeks' continuance.

■ Defendant's contentions (3), (4) and (5) are related. The first two pertain to identification procedures approved in *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Simmons* v. *United States,* 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967]. ■ Defendant would have us extend the *Wade* requirement that counsel be present at lineups to situations where witnesses are shown photographs by the police in their efforts to identify perpetrators of crimes. This is not constitutionally required. (*Simmons* v. *United States, supra,* at p. 384 [19 L.Ed.2d at p. 1253]; *People* v. *Lawrence,* 4 Cal.3d 273, 277 [93 Cal.Rptr. 204, 481 P.2d 212]; *People* v. *Dontanville,* 10 Cal.App.3d 783, 791 [89 Cal.Rptr. 172].)

We agree with the philosophy of *Simmons,* and must follow its principles (at p. 384 [19 L.Ed.2d at p. 1253]): "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. ■ Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misiden-

tification." ■ Defendant claims that the People have failed to satisfy their burden of showing that the pretrial photographic identification procedure was not unduly suggestive. He relies solely on the fact that in response to his subpoena duces tecum, the People were unable to produce the series of photographs used in 1968. This kind of argument assumes that the People's burden arises when a defendant asserts a claim of unfairness. The mere claim of unfairness is not enough. The burden does not arise until there is some evidence that the photographic identification procedure was impermissibly suggestive. ■ In the instant case, there is absolutely no evidence of undue suggestion created by the procedures used. The testimony of the witness is clear and frank, and there is no hint of connivance, evasion or skulduggery on the part of the police. The evidence strongly shows that the procedures were fair, as demonstrated by the witness' testimony that when he looked through the second group of photographs, he set aside four, and then reexamined them and picked out defendant's photograph from the four. This is clear evidence that defendant's photograph did not stand out from the rest or that it was unusual in any way. The production of the photographs in question used by the police would be the ultimate in the way of proof that they were not unduly suggestive, but it is not mandatory. When the burden of proof indeed does shift to the prosecution to demonstrate the fairness of a photographic identification procedure, it may be extremely difficult in most cases to prove its fairness without the photographs, but we do not impose this requirement as a matter of law. In addition to a complete lack of a showing of unfairness, defendant made full use of his opportunity to cross-examine the witnesses so as to expose "to the jury the method's potential for error." We cannot conclude that the instant procedure gave "rise to a very substantial likelihood of irreparable misidentification." Under the circumstances here present, there was no error.

■ Defendant's contention (6) is based on his assertion that the prosecution did not in any way show that the in-court identification by Aguilar was the product of Aguilar's independent memory. This is directly contra to the facts in the record. Aguilar testified that he had no doubt of his identification of defendant, and felt that he could identify defendant from his observations at the liquor store independently of any viewing of photographs. Defendant also discusses the hazards inherent in an in-court identification and inferentially would have this court impose a requirement that the prosecution prove that the identification was free from the "suggestiveness of the court's proceedings." We recognize that every accused present at trial bears a burden and/or stigma of the *allegation* of guilt by the very fact of his being on trial, but *Wade* and *Simmons* and their progeny do not extend to this aspect of the identification process.

█ Defendant's contention (5) is that the delay in the commencement of his prosecution resulted in a denial of due process of law. █ His assertions in support of this contention are answered by our Supreme Court's decision in *Jones* v. *Superior Court,* 3 Cal.3d 734, 740 [91 Cal. Rptr. 578, 478 P.2d 10]: "Delays necessary for reasonable law-enforcement operations will not violate the right to a speedy trial. The conduct of law-enforcement officials would be affected only if they unreasonably delayed initiating prosecution." █ The court further stated: "The prejudicial effect of the delay on petitioner must be weighed against any justification for the delay."[2] █ Defendant also asserts that the prosecution has the burden of demonstrating that the delay was not prejudicial to the defendant. He misconstrues the law's requirements. The prosecution must show justification for the delay. The defendant must show the prejudicial effect of the delay. █ The justification for the delay is obvious from the record. The police spent time identifying the perpetrator of the crime, in conjunction with the fact that defendant was out of the state, which compounded the problem in locating him. Defendant has not shown that these reasons are not legitimate (see *People* v. *Dontanville, supra,* 10 Cal. App.3d 783, 789), and his claimed denial of due process of law because of the delay therefore fails.

The judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred.

A petition for a rehearing was denied August 19, 1971, and appellant's petition for a hearing by the Supreme Court was denied October 21, 1971.

---

[2]The court (in fn. 1, at p. 741) clearly points out that these criteria are not limited to the right to a speedy trial, but also apply to the denial of due process of law, "It should be pointed out, . . . that a claimed denial of due process would be decided by the same approach, namely, balancing the effect of the delay on the defendant against any justification for the delay."