Filed 4/11/14  P. v. Nguyen CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048348 |
| v. | (Super. Ct. No. 11WF2920) |
| DAVID KHOA NGUYEN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

David Khoa Nguyen appeals from a judgment after a jury convicted him of possession of methamphetamine for sale, furnishing methamphetamine, and maintaining a place for selling or using methamphetamine. Nguyen argues insufficient evidence supports his conviction for furnishing methamphetamine and the trial court's sentence violated Penal Code section 654. We disagree and affirm the judgment.

FACTS

Detectives Robert Cortes, Donald Farmer, and Pat Estes conducted a multi-day covert surveillance operation of Nguyen's home at 13212 Partridge in Garden Grove situated at the end of a cul-de-sac. All were members of the special investigations unit and experts in narcotics investigations.

On December 7, 2011, Estes, the point person, saw six different vehicles arrive at the residence. One of the vehicles was a silver Honda Civic, driven by Kosal Kim, a man who had been the subject of previous surveillances and who officers knew from his booking photographs. Kim went inside the house.

On December 8, 2011, Farmer acted as the point person on this day. At about 12:30 p.m., a gray Toyota Tundra arrived at the house. The occupant of the truck went inside for about 20 minutes and then drove away. About two and one-half hours later, a white GMC truck drove into the cul-de-sac, turned, and stopped at the end of the cul-de-sac, near where Farmer was located. A female Hispanic, later identified as Patricia Chavez, Nguyen's girlfriend, exited the house, walked down the street, and got into the truck. The male driver handed Chavez what appeared to be money, and she handed the man a small object. Chavez got out of the truck, walked home, retrieved the mail from the mailbox, and went inside. One hour later, a white Toyota Camry arrived at the residence. A female Hispanic got out of the car, went inside for a short time, came out of the house, and drove away. About one and one-half hours later, a Ford Explorer (the SUV) arrived at the house. Several people got out of the SUV and went inside the

residence. A little later, a male Hispanic left the house, got into the SUV, and drove to a nearby smoke shop. The SUV returned to the residence. One hour later, a silver Honda Civic arrived at the residence. Kim got out of the car and entered the residence. About 15 minutes later, Kim exited the residence and walked to a Toyota Camry that had arrived. Kim and the driver walked into the residence and back to the car where Kim spoke with someone in the car's backseat. Kim returned to the residence. About 8:30 p.m., a dark colored BMW parked on the driveway. A male Hispanic exited the house and walked to the driver's side of the BMW. After they spoke, the man went inside the residence, and the BMW drove away.

On December 9, 2011, Farmer again was the point person. About 1:50 p.m., Kim arrived in the silver Honda Civic and went inside with a package. He left the residence about five minutes later; he was not carrying anything. About 40 minutes later, the same gray Toyota Tundra as the day before arrived at the residence. The driver went inside for a few minutes, came outside, and drove away. Two hours later, the same SUV from the day before arrived at the residence. Several people again went inside the residence and left about one hour later. While the occupants in the SUV were inside the residence, a silver Ford Mustang arrived at the residence. The driver went inside for a few minutes, came out, and drove away. Estes saw a green Chevrolet Impala arrive at the residence, its occupants go inside for a few minutes, leave the house, and drive away.[1]

On December 13, 2011, at about 5:45 p.m., it was very dark in the front of the residence. Estes saw someone leave the residence and get into a white Toyota Camry. Officers, including Estes, followed the car. Estes could not see anyone other than the car's driver. Officers followed the car to a hardware store where Estes saw Nguyen get out of the back seat. Nguyen left the store and entered the car's back seat. Officers followed the car. The lights of the oncoming vehicles illuminated the Camry as

---

[1] It is unclear from the record whether this occurred on December 9 or December 10.

officers pursued the car. Estes could only see the driver's silhouette, and he believed Nguyen was crouched down in the back seat. When officers stopped the car, Nguyen was crouched down in the back seat. Officers found two methamphetamine pipes in the car.

Cortes told Nguyen they had a search warrant to search his house, and Nguyen said Chavez was home and he gave them a key. Officers transported Nguyen to the police station.

Officers executed the search warrant at Nguyen's residence. Officers found Chavez and a home with only wood beams and no interior walls. On a table, officers found a black Colt .45 replica handgun. In an area that appeared to be an office, officers found a safe with a touch keypad. Chavez gave Estes a combination that did not unlock the safe. Estes called the police station and obtained the combination from Nguyen. Officers found the following in the safe: (1) a Ziploc bag containing $115 in cash; (2) two Ziploc bags containing what was later determined to be methamphetamine; and between 30 and 50 one-inch resealable plastic bags. One of the bags contained 6 grams of methamphetamine and the other bag contained 5.5 grams of methamphetamine. Officers also found a small Ziploc bag on the floor with what appeared to be .4 grams of methamphetamine. In an area that appeared to be Nguyen's room, officers found a small plastic bag containing .4 grams of what appeared to be methamphetamine. Officers also found a scale that appeared to be covered in a white residue. Finally, officers found methamphetamine smoking pipes throughout the house.

After advising Nguyen of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, Cortes questioned him at the police station. We will provide the details of the interview below.

An information charged Nguyen with possession for sale of a controlled substance, methamphetamine (Health & Saf. Code, § 11378) (count 1), sale or transportation of a controlled substance, methamphetamine (Health & Saf. Code,

4

§ 11379, subd. (a)) (count 2), maintaining a place for selling or using controlled substances, methamphetamine (Health & Saf. Code, § 11366) (count 3), and street terrorism (Pen. Code, § 186.22, subd. (a)) (count 4). The information alleged Nguyen committed these offenses on or about December 13, 2011. The information alleged Nguyen was previously convicted of violating Health and Safety Code section 11378 (Pen. Code, § 1203.07, subd. (a)(11)), as to count 1. The information alleged he committed counts 1, 2, and 3 for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)). Finally, the information alleged he suffered two prior felony Health and Safety Code convictions (Health & Saf. Code, § 11370.2, subd. (c)), and two prior prison terms (§ 667.5, subd. (b)).

At trial, the prosecutor offered the following testimony. Farmer testified concerning his background, training, and experience in narcotics investigations. He had seen methamphetamine hundreds of times, made over 100 methamphetamine related arrests, made in excess of 20 methamphetamine for sales related arrests, and participated in over 100 surveillance operations. He had spoken with methamphetamine sellers about how the drug is packaged and priced. He was familiar with the nature of hand-to-hand drug sales. Farmer opined the residence in question was being used for drug sales based on the vehicle and foot traffic.

Estes also testified concerning his background, training, and experience in narcotics investigations. Estes detailed his training, including how narcotics are packaged, concealed, and sold. Estes stated he had participated in over 500 narcotics investigations, interviewed over 350 abusers and sellers, participated in over 100 narcotic search warrants, and written over 30 narcotics search warrants. He explained the factors relied on to determine whether a person sells methamphetamine are quantity, packaging, pay/owe sheets, scales, handguns, and high vehicle and foot traffic. He opined people who use narcotics possess generally one-half a gram to one gram because narcotics users are usually unemployed, buy only what they can afford, and use the drug immediately.

5

He added that if a person had more than one gram he would suspect the person sold narcotics and he would look for other factors. He said a usable quantity of narcotics is any amount that you can manipulate with your fingers.

Estes explained there are street dealers, mid-level dealers, and major drug cartels. Street dealers usually possess one and one-half grams to 28 grams and on average possess six or seven grams. Street dealers are not sophisticated and sell drugs from their homes and are mobile. They usually use methamphetamine and and will use a portion of their profit to purchase more methamphetamine. They also pool money from other people to purchase a large quantity and distribute the methamphetamine among the people. Some street level dealers use runners to distribute narcotics. Mid-level dealers sell narcotics that are purer and have a direct connection with the drug cartels. Mid-level dealers are more sophisticated; they have lookouts, use runners who move the narcotics, and have lawyers on retainer. Major drug cartels are involved in the manufacture, smuggling, and distribution of narcotics and are very sophisticated.

Estes stated the most common packaging on the street is small, resealable baggies one inch square to one-half inch square. He opined users who are not sellers would not possess multiple small resealable baggies. Based on his background, training, experience, and surveillance, Estes opined the activity at the residence was consistent with narcotics sales. He added the two large Ziploc bags of methamphetamine found in the safe were "without a doubt" there to be sold.

On cross-examination, Estes agreed people trade money, sex, and work for drugs. On redirect examination, he said street level sellers will often smoke methamphetamine with the buyer. Estes said it was "very seldom" he encountered a person who used two grams of methamphetamine a day.

Cortes testified concerning his interview with Nguyen.[2] Nguyen stated he lived at the residence for three months. Nguyen admitted the safe and its contents were his, and he claimed he used the plastic bags to put his methamphetamine in. Nguyen said he allowed people to come to his home and smoke methamphetamine and this was "possibly" the explanation for the heavy vehicle and foot traffic. He also admitted he would "trade" methamphetamine. He "may have" used "runners" to purchase methamphetamine for him. His employment consisted of doing "odd jobs" for people, such as repairing their cellular telephones.

On cross-examination, Cortes testified that Nguyen repeatedly denied selling methamphetamine. Nguyen claimed he used 3.5 grams of methamphetamine per day. Defense counsel explored the topic of Nguyen "trading" methamphetamine. When counsel inquired whether Nguyen said he performed work in exchange for methamphetamine, Cortes replied, "No. That's not what I meant." Counsel asked, "[Y]ou are saying that he told you he traded methamphetamine with other people?" Cortes responded, "Yes." He also admitted he and his friends would combine their money and purchase methamphetamine together. On redirect examination, Cortes stated that based on his training and experience, 3.5 grams of methamphetamine is not for personal use, and he had never encountered anyone who claimed to use that much per day.

Forensic scientist Bill Edinger testified for the prosecution. Pursuant to established crime lab procedures, Edinger testified one of the four bags was determined to be 4.859 grams of methamphetamine.

---

[2] The interview was video and audio recorded. Cortes listened to the interview twice before he testified.

Detective Matthew McLeod testified as a gang expert for the prosecution concerning Tiny Rascals criminal street gang and Nguyen's active participation in the gang. The parties stipulated that in 2008 and 2011, Nguyen was convicted of a felony that was not a crime of violence and was not a gang crime. Nguyen rested on the state of the evidence.

As relevant here to count 2, the jury instructions and the prosecutor's argument establish the basis for the offense was that Nguyen *furnished* methamphetamine.[3]

The jury convicted Nguyen of counts 1, 2 (furnishing a controlled substance-methamphetamine), and 3 but could not reach a verdict on count 4 or the street terrorism enhancements. Pursuant to the prosecutor's motion, the trial court dismissed count 4, the street terrorism enhancements, and one of the prior prison enhancements. Nguyen admitted he suffered the other prior prison term and two prior felony Health and Safety Code convictions.

The trial court sentenced Nguyen to seven years in jail as follows: the upper term of four years on count 2 and a consecutive term of three years for one of the Health and Safety Code prior convictions. The court imposed concurrent upper term sentences of three years on counts 1 and 3. The court struck the sentences on the remaining prior Health and Safety Code conviction and the prior prison term allegation.

DISCUSSION

I. *Sufficiency of the Evidence-Count 2*

Nguyen argues insufficient evidence supports his conviction for count 2 because there was no evidence that on or about December 13, 2011, either he or anyone on his behalf was furnishing narcotics. We disagree.

---

[3] In prosecuting count 1, possession of methamphetamine for sale, the district attorney focused on the methamphetamine officers found in the safe.

8

"'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.]  "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'  [Citations.]"  [Citation.]  '"Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt."'"  [Citation.]"  (*People v. Abilez* (2007) 41 Cal.4th 472, 504 (*Abilez*).)

Health and Safety Code section 11379, subdivision (a), in relevant part provides:  "[E]very person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport any controlled substance [as defined] . . . shall be punished by imprisonment . . . for a period of two, three, or four years."  "Furnish" is defined as "to provide or supply with what is needed, useful, or desirable."  (Webster's 3d New Internat. Dict. (1981) p. 923.)  The prosecutor is not required to prove the offense occurred on the alleged date but rather that the offense occurred reasonably close to the alleged date.  (*People v. Peyton* (2009) 176 Cal.App.4th 642, 660.)

Nguyen concedes a person may violate Health and Safety Code section 11379 without selling narcotics (*People v. Fritz* (1970) 11 Cal.App.3d 523, 526 [defendant gave drugs to undercover officer gratis]), and without directly dealing with

9

buyer/user (*People v. Taylor* (1959) 52 Cal.2d 91, 94 [defendant furnished drugs to buyer through a third party]). He argues, however, there was no evidence that on December 7 through December 13 he furnished anyone with narcotics or that Chavez furnished narcotics on his behalf. He relies on the facts officers never saw him until December 13, and officers did not observe any hand-to-hand drug transactions on December 13. He adds that the other evidence demonstrates the methamphetamine officers found was strictly for his personal use. We disagree.

"The corpus delicti rule requires the prosecution to prove that 'the charged crime actually happened' exclusive of the accused's extrajudicial statements. [Citation.] Only a 'slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient.' [Citations.] Such evidence need not point to defendant as the perpetrator. [Citation.]" (*People v. Ray* (1996) 13 Cal.4th 313, 342.)

Here, Nguyen's statements, the officers' observations, and the expert testimony provided evidence from which the jury could reasonably conclude Nguyen provided and supplied methamphetamine in December 2011. Nguyen admitted he allowed people to come to his house and use methamphetamine. Over the course of three days, December 7, 8, and 9, officers observed approximately 17 vehicles arrive at Nguyen's home, most of which stayed for a very short period of time before leaving. Estes testified some street-level dealers use runners to distribute narcotics.

On December 8, Farmer saw Chavez walk out of the house and get into a white GMC truck that stopped at the end of the cul-de-sac. The male driver handed Chavez what looked like money, and Chavez handed the man a small object. Estes stated the most common packaging on the street is small, resealable baggies one inch square to one-half inch sqaure. Officers found between 30 and 50 of this type of bag in the safe that Nguyen admitted was his and to which he knew the combination. Nguyen admitted he used runners, although he claimed it was to purchase drugs not furnish them. Contrary

10

to Nguyen's assertion otherwise, this evidence supports the conclusion Nguyen was inside the home and sending Chavez out to furnish drugs to others.

Additionally, Estes testified street-level dealers combine money with other people to purchase a large quantity and distribute the methamphetamine to the people. Nguyen admitted to Cortes he did this. Nguyen also admitted he furnished methamphetamine with others. Although it was initially unclear what Cortes meant by traded, he clarified Nguyen told him that he traded methamphetamine with others. Based on Nguyen's statements, the heavy vehicle and foot traffic during the three days, Chavez's conduct on December 8, and the methamphetamine and drug paraphernalia found in Nguyen's home, it was certainly reasonable for the jury to conclude Nguyen provided and supplied, i.e., furnished, others with methamphetamine. We decline Nguyen's invitation to reweigh the evidence and substitute our judgment for the jury's judgment to conclude he possessed the methamphetamine solely for personal use. (*Abilez, supra,* 41 Cal.4th at p. 504.) Therefore, sufficient evidence supports Nguyen's conviction for count 2.

## II. *Penal Code section 654-Counts 1 & 2*

Relying on Penal Code section 654, Nguyen contends the trial court erred in imposing a concurrent three-year term on count 1. Again, we disagree.

Penal Code section 654 provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The purpose of the statute is "to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense—the one carrying the highest punishment. [Citation.]" (*People v. Liu* (1996) 46 Cal.App.4th

11

1119, 1135, fn. omitted.)  The section's protection extends to cases in which a defendant engages in a course of conduct that violates different statutes and comprises an indivisible course of conduct punishable under separate statutes.  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  "Multiple punishment is permissible if appellant entertained multiple criminal objectives which were independent of and not merely incidental to each other.  [Citation.] A defendant's criminal objective is 'determined from all the circumstances and is primarily a question of fact for the trial court, whose findings will be upheld on appeal if there is any substantial evidence to support it.'  [Citation.]" (*People v. Braz* (1997) 57 Cal.App.4th 1, 10.)

Here, substantial evidence supports the trial court's implicit finding Nguyen entertained multiple criminal objectives.  As we explain above, there was sufficient evidence Nguyen furnished methamphetamine to others when Chavez delivered narcotics to the man in the truck and when Nguyen admitted he "traded" methamphetamine (count 2).  Additionally, there was sufficient evidence Nguyen intended to sell the two large bags of methamphetamine found in the safe because in addition to the narcotics, officers found 30 to 50 small, resealable bags and cash (count 1).

Where, as here, each sale consumes only part of his inventory, Nguyen may be punished separately for the possession of his unsold narcotics.  (*People v. Fusaro* (1971) 18 Cal.App.3d 877, 894, disapproved on another ground in *People v. Brigham* (1979) 25 Cal.3d 283, 292; *In re Adams* (1975) 14 Cal.3d 629, 633 ["if a person sells only part of the narcotics he possesses, both the offenses of possession and sale may be punished, since possession of the excess unsold narcotics was not necessary to the sale"]; *People v. Goodall* (1982) 131 Cal.App.3d 129, 147.)  The trial court therefore was not required to stay Nguyen's sentence on count 1.

DISPOSITION

The judgment is affirmed.



                                        O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


MOORE, J.


13